UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHARON M. PENNELL

                Plaintiff,

v.

PAUL E. ARROWOOD and
BRYAN JONES

                Defendants.

_____/

Case No. 1:24-cv-10048

Honorable Thomas L. Ludington
United States District Judge

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AS TO
BOTH DEFENDANTS AND DISMISSING PLAINTIFFS' COMPLAINT**

In 2020, Plaintiff Sharon Pennell was stopped and arrested for suspicion of Operating
While Intoxicated (OWI) and for possessing open containers containing alcohol in violation of
MICH. COMP. LAWS §257.625(1). Plaintiff alleges that Defendants' arrest violated several of her
constitutional rights under 42 U.S.C. § 1983 and state law. Defendants filed separate motions for
summary judgment on March 20, 2025. They argue that they did not violate Plaintiff's
constitutional rights or state law, and, even if they did, their actions are protected by qualified
immunity. As explained below, Defendants' motions for summary judgment will be granted.

**I.**

**A.**

At around 2:30 a.m. on December 13, 2020, Defendants Paul Arrowood and Bryan Jones—
Troopers with the Michigan State Police (MSP)—were on patrol in Bay City, Michigan, when they
observed Plaintiff Sharon Pennell commit a lane violation while driving a minivan. ECF No. 29 at
PageID.341. After observing Plaintiff enter and exit a residential driveway, Defendants began
following her. *Id.* Dash-camera footage captured the events that followed.

After leaving the residential driveway, Plaintiff stopped at a traffic light and then proceeded, with Defendants following her without activating their emergency lights. ECF 28-3 at 0:00–25. Plaintiff then pulled into another driveway. At that point, Defendants activated their lights, accelerated, and parked behind Plaintiff's minivan in the driveway. *Id.* at 0:25–35. Defendants exited the cruiser and approached Plaintiff's vehicle to question her. *Id.* at 0:35–48.

At the outset of the encounter, Defendant Jones asked Plaintiff, "Do you live here?" *Id.* at 0:52–58. She responded, "yeah"[1] and that she "just dropped a friend off." *Id.* Defendant Jones requested her license and registration and told her that she had been stopped because she was "over the center line back there." *Id.* at 1:19–22. Plaintiff replied that the "road is really super bad." *Id.*

Defendants inquired into why Plaintiff was out driving at that time, but her response is unintelligible on the dash-cam footage. *Id.* at 1:27. Defendants then asked about open alcohol containers they observed in her van. Plaintiff responded that there was "no open alcohol or nothing," even though there were open beer bottles visible on the floor of Plaintiff's van. *Id.* at 1:45. She asserted that the bottles and cans were empty. *Id.* at 1:46.

Defendants again informed Plaintiff that they suspected her of drunk driving. Plaintiff responded that she would "call a lawyer." *Id.* at 2:26. Defendant Jones instructed her to step out of the vehicle, but she answered, "No." *Id.* at 2:30. Defendant Jones then opened her door and again ordered her to exit. *Id.* at 2:30. Plaintiff complied and exited her van.  *Id.* at 2:50–3:06.

Defendant Jones sought consent to search Plaintiff for weapons. She responded, "I don't have any weapons, and I don't understand," trailing off as Defendant Jones searched her. *Id.* Defendants then escorted Plaintiff to the front of the police cruiser, notified her that she was being

---

[1] Notably, Plaintiff later admits that she lives "two blocks away" from where Defendants stopped her. *Id.* at 7:43.

recorded, and stated that they could administer field sobriety tests to "make sure [she's] safe to drive." *Id.* at 3:20–26. Plaintiff appeared to agree. *See id.* But before the tests were administered, Defendant Jones asked Plaintiff when she last consumed alcohol, to which Plaintiff replied, "a couple of hours ago." *Id.* at 3:30–40. Plaintiff also admitted that she had a medical marijuana card and had consumed marijuana earlier that night. *Id.* at 3:54.

Defendant Jones instructed Plaintiff to face him so he could administer the first test, a Nystagmus exam.[2] Plaintiff resisted, stating that she did "not feel safe" while glancing toward Defendant Arrowood. *Id.* at 4:22. Defendant Jones explained that he was administering the tests because Plaintiff had crossed the center line and had admitted to drinking earlier that night. *Id.* at 4:36–46. Plaintiff asked to call a lawyer or her boyfriend, but Defendant Jones again directed her to complete the sobriety exams. *Id.* at 5:00.

After that, Defendant Jones administered the Nystagmus exam. *Id.* at 5:10–6:28. During the exam, Defendant Arrowood asked Plaintiff how many times she had been arrested. She replied that she had been arrested once before for "drunk driving." *Id.* at 6:28–48. Defendant Jones resumed the exam. *Id.* at 7:01.

After completing the Nystagmus test, Defendant Jones instructed Plaintiff to face sideways, with her right side facing the camera, in preparation for the next test. *Id.* at 8:13. Plaintiff initially complied but asked to retrieve her coat from the car. Defendant Jones instructed her that they would "be done soon." *Id.* at 8:13. Plaintiff was then instructed to take nine heel-toe steps down and then take nine heel-toe steps back. *Id.* at 8:30–35. That time, Plaintiff did not comply,

---

[2] The Horizontal Gaze Nystagmus exam checks for Nystagmus—involuntary jerking of the eye—as the eyes move from side to side. *Horizontal Gaze Nystagmus (HGN)*, NCDD, (last visited Nov. 13, 2025) https://www.ncdd.com/dui-defenses-that-work/horizontal-gaze-nystagmus. Expand on this a bit. What does it mean?

stating that she was "freezing" and "shaking." *Id.* at 8:35. When Defendant Jones asked Plaintiff whether she would complete the test, she shrugged and reiterated that she was "shaking." *Id.* at 8:51. After a brief exchange, she again explained that she did not want to do the heel-toe test. *Id.* at 8:51–9:20.

Defendant Arrowood then appeared to shine his flashlight through the windows of Plaintiff's van and stated that there was "open alcohol" inside. *Id.* at 9:20. Plaintiff again denied that there was open alcohol, asking, "What do you mean by open alcohol?" *Id.* at 9:35. Defendant Arrowood exclaimed, "that big bottle of fucking Smirnoff that's in there," *id.* at 9:37, prompting Plaintiff to interject that it was "in the crate" in her car. *Id.* at 9:38.

Defendant Jones then again attempted to have Plaintiff perform the heel-toe test. But Plaintiff again declined, stating that she was shaking. *Id.* at 9:54. Defendant Jones repeatedly asked whether she was refusing the tests. Each time, Plaintiff explained that she was not refusing but wanted "to call a lawyer." *Id.* at 10:00–11.

Defendant Jones informed her that she was refusing and asked whether she would take a preliminary breath test (PBT)[3] instead. *Id.* at 10:12–20. After further back-and-forth, Defendant Jones repeated his request for her to "do a PBT," to which Plaintiff replied that she did not know "how those things work." *Id.* at 10:20–11:37. Defendant Jones walked towards the cruiser, stating that he would "explain everything" after retrieving the PBT. *Id.* As he did so, Plaintiff stated, "Fine, I'll walk your line." *Id.* at 11:37. But immediately after, she and Defendant Arrowood began

---

[3] A PBT is a handheld, breath alcohol test administered roadside during a traffic stop if a driver is suspected of driving under the influence. *Preliminary Breath Test vs. Breathalyzer Test*, ALPERT SCHREYER, (last visited Nov. 13, 2025), https://andrewalpert.com/blog/preliminary-breath-test-vs-breathalyzer-test/.

arguing, which led to Plaintiff declining to do the heel-toe test, citing her shaky legs and the cold. *Id.* at 12:15.

While Defendant Jones was ostensibly still retrieving the PBT, Plaintiff called out that she was "not going to do" the PBT and told him that he could "arrest [her] and take [her] to jail, so [she] can call [her] lawyer." *Id.* at 12:55–59. Defendants responded that she had open alcohol in the van. *Id.* at 13:16. Plaintiff expressed confusion, asking, "You can't have a bottle that's closed? Why?" *Id.* at 13:21. When Defendants explained that the bottles were half empty, Plaintiff replied that they had "been that half gone" and that she had been carrying them in the backseat "since camping." *Id.* at 13:26–33.

Soon after, Defendant Jones asked Plaintiff if she had ever taken a PBT. Plaintiff responded, "I'm not taking that," and unequivocally confirmed that she was refusing the PBT. *Id.* at 13:54–58. After that, Defendant Jones returned to the cruiser to "run her real quick." *Id.* at 14:27.

Shortly after that, Defendant Jones asked to meet with Defendant Arrowood in the cruiser. *Id.* at 17:20. Defendant Arrowood asked Defendant Jones, "Why isn't she hooked up?" to which he responded, "Don't really know what to go off of." *Id.* at 17:22–30. Defendant Arrowood stated that "she's got open alcohol in there . . . is she intoxicated or not?" Defendant Jones replied, "I didn't notice any nystagmus, no." *Id.* at 17:30–36. Defendant Arrowood then stated that they could "hook this car for open intox." *Id.* at 17:40.

Both Defendants exited the cruiser, and Defendant Jones handcuffed Plaintiff. *Id.* at 17:58. Defendant Arrowood again asked Plaintiff why she refused the PBT. Plaintiff stated that she did not "know what" it was, *id.* at 18:43, despite Defendant Jones's earlier explanations. Defendant Jones then conducted another search of Plaintiff. *Id.* at 18:50. Afterward, Defendants placed Plaintiff in the back of the cruiser. ECF No. 28-5 at 20:05.

Defendant Arrowood then shined his flashlight through the second-row windows of Plaintiff's vehicle before joining Defendant Jones in the cruiser. ECF No. 28-3 at 20:05–21:00. Plaintiff alleges that Defendant Arrowood called her a "bitch" when he entered the cruiser, ECF No. 31-1 at PageID.384, but the video does not capture such a statement.

A short time later, Defendants noticed that one of Plaintiff's hands had slipped out of a handcuff. ECF No. 28-5 at 22:02. Both Defendants apparently exited the cruiser. Defendant Arrowood opened the cruiser's rear door, stating, "You're about to get a fucking felony." *Id.* at 22:15. Plaintiff placed her hands behind her back, and Defendant Arrowood grabbed her right arm to re-cuff her. *Id.* at 22:08–16. But then Plaintiff pulled her arm away from Defendant Arrowood and attempted to grab the headrest with her other hand. *Id.* at 22:16–23. Defendant Arrowood then pulled Plaintiff out of the cruiser and took her to the ground. *Id.* at 22:23.

While not visible on the dash-cam footage, Plaintiff alleges that Defendant Arrowood "slammed [her] hard onto the ground facedown" and placed his knee on her back with his full weight. ECF No. 31-1 at PageID.385. Notably, though, the video does not show Plaintiff yelling out in pain. ECF No. 28-5 at 22:27–23:00. While recuffing Plaintiff, Defendant Arrowood told her that she "got a felony" for "resisting arrest." *Id.* at 23:00–23:15. Plaintiff was then recuffed and placed back in the cruiser. *Id.* at 23:40.

Defendant Arrowood then searched Plaintiff's van. ECF No. 28-3 at 24:15. During that search, Defendant Arrowood pulled out three bottles from the back seat of Plaintiff's car, all of which appear to be only partially full, and placed the three bottles on the hood of the cruiser:



*Id.* at 24:15–25:40. Later, the farthest right bottle fell off the hood and onto the ground. *Id.* at 25:43.

Defendant Jones informed Plaintiff that she was under arrest for operating while intoxicated (OWI) and read her rights. *Id.* at 25:05–26:20. He also requested that she take a chemical blood test, which Plaintiff refused. *Id.*

Defendant Jones then left the cruiser and asked Defendant Arrowood for a refusal form. *Id.* at 27:12. At that point, both Defendants returned to the cruiser, and Defendant Arrowood picked up the bottle that had fallen to the ground. *Id.* at 27:25. Plaintiff asserted that the fallen bottle was not alcohol. *Id.* at 27:39.

Defendant Arrowood then returned to Plaintiff's van to conduct an inventory search. *Id.* at 28:17. Importantly, during the search, Defendant Arrowood opened the trunk, and the second-row seats of Plaintiff's van were upright. *Id.* at 31:51. While the search was underway, Plaintiff again argued with Defendant Jones about the alcohol found in her van, maintaining that the alcohol was "in the crate in [her] backseat." ECF No. 28-5 at 30:53. Defendant Arrowood then returned to the cruiser after completing the search. *Id.* at 32:44.

After that, Defendant Jones filled out a search warrant. *Id.* at 33:00. When Plaintiff states that Defendant Arrowood just "searched [her] vehicle," Defendant Arrowood explained that the warrant is "for [her] blood." *Id.* at 33:00–33:10.

When a tow truck arrived, Defendant Jones exited the cruiser to photograph the alcohol bottles, still on the hood. ECF No. 28-3 at 42:29. He then poured out the contents of the bottles. *Id.* at 43:00. Plaintiff's van was subsequently towed. *Id.* at 43:46.

Defendants transported Plaintiff to McLauren Hospital, seemingly for a blood draw.[4] ECF No. 28-5 at 49:12. Plaintiff contends that during the drive, Defendant Arrowood became "more angry and unstable" and made gestures that appeared to her as if he were "smelling his armpits and grunting." ECF No. 31-1 at PageID.387. But the dash-camera footage of the trip does not depict such conduct. ECF No. 28-5 at 49:30–55:34. After arriving at McLauren Hospital, the footage ends. *Id.* at 55:34.

Plaintiff alleges that inside the hospital, Defendant Arrowood repeatedly referred to her as a "bitch." ECF No. 31-1 at PageID.399. At any rate, while there, Plaintiff's blood was drawn at 4:15 a.m. ECF No. 29 at PageID.344. The blood test results showed no detectable alcohol in Plaintiff's system. *Id.*

Plaintiff was charged with a second offense OWI, resisting or obstructing a police officer, and open intoxicants in a motor vehicle. *Id.* at PageID.344–45. The Bay County Prosecutor ultimately dismissed the charges via *nolle prosequi*. *Id.*

---

[4] In her Complaint, Plaintiff alleges that Defendant Jones "drove her to a local judge's house first to get a search warrant" for her blood. ECF No. 1-1 at PageID.12. But that is contradicted by video evidence.

**B.**

Plaintiff initially filed this action in the 18th Circuit Court for Bay County, Michigan. Defendants removed the case to this Court on January 8, 2024. ECF No. 1.

Plaintiff asserts four claims.  First, Count I alleges that Defendants unlawfully seized her in violation of the Fourth Amendment by subjecting her to an improper traffic stop and arresting her without a warrant or probable cause. ECF No. 1-1 at PageID.14. Second, Count II asserts that Defendants violated the Fourth Amendment by unlawfully searching her vehicle and obtaining a search warrant for her blood under false pretenses. *Id.* Third, Count III alleges that Defendants violated the Fourth Amendment by using excessive force when they "physically grabbed and violently [threw]" her to the ground during her arrest.[5] *Id.* at PageID.15. Fourth, Count IV alleges that Defendant Arrowood violated Michigan's Elliott Larson Civil Rights Act (ELCRA) by discriminating against her "based on her gender in her use of public accommodations, including the roadway, her liberty, freedom, and pursuit of happiness." *Id.*

On March 20, 2025, Defendants filed separate motions for summary judgment. ECF Nos. 28; 29.

---

[5] While Plaintiff's Complaint seemingly alleges that Count III applies to Defendant Jones, *see* ECF No. 1-1 at PageID.15, Plaintiff does not argue that Count in her Response to Defendant Jones' Motion for Summary Judgment. *See generally* ECF No. 35. "A plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment). Here, to the extent that Plaintiff pleaded Count III against Defendant Jones in her Complaint, she implicitly abandoned that claim in the Response to his Motion for Summary Judgment.

## II.

Summary judgment is proper when no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if, based on the evidence presented, a reasonable jury could return a verdict for the nonmoving party. *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018). When seeking summary judgment, the movant must identify the parts of the record showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the nonmovant to "present significant probative evidence that will reveal that there is more than some metaphysical doubt as to the material facts." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (cleaned up). Further, the mere existence of a scintilla of evidence supporting the nonmovant's position does not create a genuine dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). And courts need not accept an assertion of fact "blatantly contradicted" by the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

At this stage of the analysis, courts cannot weigh the evidence. *Id.* at 249. Nor can courts assess the competency and credibility of witnesses. *Id.* at 255. And courts must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Finley v. Huss*, 102 F.4th 789, 804 (6th Cir. 2024). But where, as here, a video captures the underlying events, "[t]his claimant-friendly standard . . . does not close [courts'] eyes" to the realities of such evidence. *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1167 (6th Cir. 2025). Rather, courts are "free to assess" video evidence "'in the light depicted by the videotapes.'" *Id.* (quoting *Scott*, 550 U.S. at 381).

### III.

### A. Plaintiff's Constitutional Claims

The analysis begins with Plaintiff's 42 U.S.C. § 1983 constitutional claims against Defendants. Defendants seek summary judgment, contending that Plaintiff cannot establish that they violated her constitutional rights, and even if she could, they are entitled to qualified immunity. *See generally* ECF Nos. 28; 29.

Where applicable, qualified immunity protects government officials from civil liability. *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). It applies to Plaintiff's § 1983 claims against Defendants unless their conduct violated Plaintiff's clearly established constitutional rights. *Finley*, 102 F.4th at 804 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This standard implicates two questions: (1) Did Defendants' conduct violate Plaintiff's constitutional rights? (2) If so, were the rights clearly established on December 13, 2020? *See Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 438 (6th Cir. 2013). This Court can address these questions in any order, and "if the answer to either question is 'no,'" then Defendants are "entitled to qualified immunity." *Finley*, 102 F.4th at 804–05. When filtered through these questions, none of Plaintiff's constitutional claims survive summary judgment.

### 1. Count I: Unlawful Seizure

### *a. Constitutional Analysis*

Start with Plaintiff's Fourth Amendment unlawful seizure claim (Count I) against both Defendants. Plaintiff's first theory for this claim alleges that Defendants subjected her to a traffic stop without a proper factual basis. ECF No. 1-1 at PageID.14.

The Fourth Amendment guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. When police officers stop motorists, they are considered "seized" under the Fourth Amendment. *United States v. Pacheco*,

- 11 -

841 F.3d 384, 389 (6th Cir. 2016) (citing *Brendlin v. California*, 551 U.S. 249, 256–59 (2007)). "A police officer may stop a motorist when he possesses probable cause of a civil infraction *or* has reasonable suspicion of criminal activity." *Id.* (citing *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012)) (emphasis added). Here, Defendants had probable cause to believe that Plaintiff committed a civil infraction when she crossed the center line.

The Fourth Amendment "permits an officer who has probable cause to believe that a traffic violation is occurring to detain the automobile." *United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003) (citing *Whren v. United States*, 517 U.S. 806, 812–13 (1996)). "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Hicks*, 190 F. Supp. 3d 733, 741 (S.D. Ohio 2016) (quoting *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)). An officer's observation of a traffic violation provides sufficient probable cause to initiate a traffic stop. *Id.*; *see also United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010); *United States v. Burton*, 334 F.3d 514, 517 (6th Cir. 2003).

Defendants state that they observed Plaintiff cross the center line marker—a civil infraction—in violation of MICH. COMP. LAWS § 257.642.[6] ECF No. 29 at PageID.349; ECF No. 28 at PageID.249. In relevant part, § 257.642 states the following:

> (1) When a roadway has been divided into 2 or more clearly marked lanes for traffic the following rules in addition to all others consistent with this act shall apply:
>
> (a) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver first ascertained that the movement can be made with safety.

---

[6] Defendants also argue that Plaintiff's conduct violated MICH. COMP. LAWS § 257.648. ECF No. 29 at PageID.349; ECF No. 28 at PageID.249. But because the Court finds that Defendants had probable cause to initiate a traffic stop based on a violation of § 257.642, it need not address any potential violations under § 257.648.

Crossing the center line violates that provision. *United States v. Andrews*, No. 1:22-CR-20114-2, 2024 WL 578571, at *5 (E.D. Mich. Feb. 13, 2024).

Plaintiff argues that she never left her lane or crossed the center line. ECF No. 35 at PageID.494. To support that she did not cross the center line, Plaintiff points out that in the police report, Defendants noted that they observed her "cross the white lane marker." ECF No. 28-2 at PageID.276. Plaintiff argues that the lane markers are actually yellow, and regardless, there were no lane markers because the road "was completely torn out and had no pavement or lane markers at the time." ECF No. 35 at pageID.494.

But the dash-cam audio undercuts Plaintiff's assertion. Defendant Jones told Plaintiff that Defendants stopped her because she was "over the center line back there," and Plaintiff responded that the "road is really super bad." ECF No. 28-3 at 1:19–22. Later, Plaintiff again attempted to explain her lane deviation, stating that "the road is bad over there," referring to the road where the lane violation occurred. *Id.* at 24:44–49.

And Plaintiff's deposition testimony further weakens her position, as she gave inconsistent answers about whether she crossed the center line:

Q: So in the video you explained that the road was bad in that area?

A: Yeah, I did go over any line, then yes—

Q: It was—

A: —there was potholes and there was no line at—in that time. If you are from Bay City, you know that whole road in front of all of these was a bunch of potholes and had no lines.

ECF No. 28-6 at PageID.320. Moreover, the cited police report states that Defendants observed Plaintiff illegally cross the white lane marker while heading east on *26th Street* in Bay City. ECF No. 28-2 at PageID.276. But it is clear from both Plaintiff's deposition and the police report that the lane violation occurred eastbound on *22nd street*.

Indeed, Plaintiff testified to the following:

Q: So you leave the party around 2:00 a.m., you're alone, and you're heading home. Tell me what happens next.

A: I'm driving down the street, Columbus where Columbus[7] turns into Kosciuszko, and I see I'm headed—*and I see them parked at the light.* I'm going this way. *Here is the light at Garfield and I think it's Lafayette . . .*

***

Q: First, you said you see them there. You see the troopers?

A: Yes

Q: Okay

A: *Stopped at the light.*

Q: *Stopped at the light perpendicular to the direction that you're going?*

A:  *Yes*

***

A: Okay. And I'm traveling. And they turned, and they drove beside me. *I was dropping off a plate of food to a friend who worked third shift and she couldn't make it . . . The address—she's kitty corner from King's.* I turn into her driveway, and they go past. So I go, I drop the food off, I get back in my car, and I back out, and I see a vehicle with their headlights off sitting in the middle of the road, which seems kind of odd to me.

***

Q: You said you were dropping off a plate of food--

A: Yes

Q: -- to a friend of yours. It was kitty-corner to—

A: *King's Party store.* Right there on the *corner of Michigan and Lafayette.*

ECF No. 28-6 at PageID.306.

---

[7] Notably, Plaintiff is incorrect that the street that turns into Kosciuszko is Columbus. That street is Lafayette, which turns into 22nd Street before becoming Kosciuszko. *See* GOOGLE MAPS, *Map of Lafayette Street in Downtown Bay City, MI,* (last visited Nov. 13, 2025) https://tinyurl.com/4r45rc8b.

Notably, the King's Party Store on Lafayette is on 22nd street, not 26th street. *See* GOOGLE MAPS, *Map of Lafayette Street in Downtown Bay City, MI*, (last visited Nov. 13, 2025) https://tinyurl.com/272kmedv [hereinafter "*Bay City Map*"]. Plaintiff also clarified that King's Party Store sits on the corner of Michigan and Lafayette Street—where Lafayette Street becomes 22nd Street before turning into Kosciuszko Street, the location of the arrest. *Id.* She admitted that she first saw Defendants when they were parked at the traffic light at Garfield and Lafayette, ECF No. 28-6 at PageID.306, just before Lafayette transitions into 22nd street, *Bay City Map*.

Further, Plaintiff made the same representation in her Response to Defendant Arrowood's Motion for Summary Judgment. She stated that she first encountered Defendants when "they turned left off of southbound Washington/Garfield Street into the lane next to her on her left as both vehicles traveled eastbound on Lafayette Street," and that she then "followed the road's curve to the left onto Kosciuszko/22nd Street." ECF. No. 31-1 at PageID.375.

Not to mention, the police report states the following:

> *While heading East on 26th St. troopers observed the suspect vehicle cross the white lane marker.* Troopers pulled behind the vehicle. As Troopers did this, the suspect vehicle immediately pulled into a driveway on the south side of the road. Troopers viewed the registration plate on the vehicle and continued driving. As Troopers were running the registration through LEIN, the suspect vehicle *was seen driving East again on 26th St. Troopers once again got behind the vehicle.* As Troopers did this, *the suspect vehicle pulled into another driveway near the intersection of Sheridan and 26th St.* Troopers effected a traffic stop for the moving violation.

*Id.* From the police report, it is evident that Defendants did not make any turns; instead, they followed Plaintiff straight down the road, believing it to be 26th Street—when it could only have been 22nd Street.

Notably, the intersection of Garfield and Lafayette Street, as well as the area where Lafayette becomes 22nd Street, both had white center lines in December 2020, when Plaintiff was arrested:



GOOGLE EARTH, *Intersection of Garfield and Lafayette Streets on Dec 21, 2020* (last visited Nov. 14, 2025), https://tinyurl.com/y9jp6m22.



GOOGLE EARTH, *Section of Road Where Lafayette Street turns into 22nd Street on Dec 21, 2020* (last visited Nov. 14, 2025), https://tinyurl.com/4kcdp64x.

Plaintiff argues that the traffic stop lacked probable cause because she did not cross the center line in violation of Mich. Comp. Laws § 257.642 and § 257.648. ECF Nos. 35 at PageID.494; 31-1 at PageID.377. But because the facts in the record blatantly contradict Plaintiff's statements, no genuine dispute of fact exists as to whether Plaintiff crossed the center line.

The Sixth Circuit recently exposited the standards governing summary judgment:

> Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties" isn't enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Instead, the adjectives in Rule 56 matter. *Material* facts "affect the outcome of the suit under the governing law." *Id.* at 248. *Genuine* disputes about them exist when the evidence would allow a reasonable jury to rule in favor of the nonmoving party. *Id.*

*DeVooght v. City of Warren*, 157 F.4th 893, 899 (6th Cir. 2025) (emphasis in original). As the Sixth Circuit put it, "'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial,'" and "you can't beat something with nothing." *Id. (*quoting *Celotex Corp.*, 477 U.S. at 323)). And, where no reasonable jury could believe a nonmovant's account, a court need not adopt it, nor must it "put blinders on." *Id.* Importantly, *DeVooght* also made clear that "blatant contradiction" is "not limited to video evidence"; courts may also rely on audio recordings, medical records, depositions, and documentary evidence, like in this case. *Id.*

Here, Plaintiff furnishes only her own inconsistent statements that, when viewed in contrast to other record facts, lack plausibility. Those inconsistent statements do not create a genuine dispute of material fact. The record establishes that Defendants had probable cause to stop Plaintiff for a lane violation under MICH. COMP. LAWS § 257.642. Thus, Plaintiff's unlawful seizure claim based on her unlawful stop theory fails.

### b. Clearly Established

Even if Plaintiff could establish that Defendants lacked probable cause for the traffic stop, Defendants are entitled to qualified immunity because the conduct was not clearly unconstitutional on December 13, 2020, the date of Plaintiff's arrest. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). This standard "protects 'all but the plainly incompetent or those who knowingly violate the law.'" District of *Columbia v. Wesby*, 583 U.S. 48, 63 (2018). And plaintiffs bear "the burden of showing that the right was clearly established." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022).

To meet their burden, plaintiffs must show that existing law places the "official's conduct 'beyond debate' such that any reasonable official would understand that [his] conduct was unlawful." *Finley*, 102 F.4th at 808 (cleaned up). Generally, this means plaintiffs must provide an "on-point" Sixth Circuit or Supreme Court "case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Bell*, 37 F.4th at 367–68. And "[b]ecause unpublished cases are nonbinding, 'a plaintiff cannot rely on an unpublished decision to meet his burden' of showing that a right is clearly established." *Ennes v. Presque Isle Cnty.*, 773 F. Supp. 3d 400, 420 (E.D. Mich. 2025) (quoting *Bell*, 37 F.4th at 367)).

Plaintiff cites a single case: *United States v. Pacheco*, 841 F.3d 384 (6th Cir. 2016). But *Pacheco* did not deal with an unlawful traffic stop. Instead, *Pacheco* addressed whether officers had reasonable suspicion to conduct a pat-down search after making a lawful traffic stop because the vehicle they were following unexpectedly swerved across the double yellow lines. *Id.* at 388–89. Thus, *Pacheco* cannot clearly establish that the Defendants' conduct was unconstitutional when

Plaintiff was stopped for crossing the center line. Thus, qualified immunity protects Defendants' conduct.

### 2. Count I: Unlawful Arrest

#### a. Constitutional Analysis

Next, turn to Plaintiff's second Fourth Amendment theory in Count I: an unlawful arrest theory alleging that Defendants arrested her without probable cause. ECF No. 1-1 at PageID.14.

Again, the Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Any arrest without probable cause violates the Fourth Amendment. *See, e.g., Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003); *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir.1999). But "[p]olice may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime." *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996).

Probable cause for arrest exists when the "facts and circumstances within the officer's knowledge" would "warrant a prudent person" in believing that the suspect "has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *see also Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). That standard demands probability, not proof, and not a "prima facie" case. *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir.1988). Courts assess that probability by examining "all facts and circumstances within an officer's knowledge at the time of an arrest," from the perspective of a reasonable officer on the scene—not with hindsight. *Crockett*, 316 F.3d at 580 (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir.1999)) (emphasis in original); *see also Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001).

A § 1983 false-arrest claim rises or falls on probable cause. To prevail, "a plaintiff [must] prove that the arresting officer lacked probable cause to arrest the plaintiff." *Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020) (quoting *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). So a showing of "probable cause provides a complete defense to a claim of false arrest." *Halasah v. City of Kirtland*, 574 F. App'x 624, 629 (6th Cir. 2014). And officers need probable cause for only one offense—not every offense charged. *See Atkins v. Twp. of Flint*, 94 F. App'x 342, 348 (6th Cir. 2004).

Here, Defendants had probable cause to arrest Plaintiff for open intoxicants under MICH. COMP. LAWS § 257.624a(1) because she had open bottles of liquor in her vehicle. The statute prohibits an operator or occupant from transporting or possessing "alcoholic liquor in a container that is open or uncapped or upon which the seal is broken within the passenger area of a vehicle." *Id.* § 257.624a(1).

Plaintiff disputes whether the bottles contained alcohol, arguing that the dash-camera footage does not clearly show the labels and could depict a "non-alcoholic mix." ECF No. 35 at PageID.510. The audio tells a different story. While shining a flashlight into the car, Defendant Arrowood stated, "there's open alcohol in there." ECF No. 28-3 at 9:20. Plaintiff denied that assertion and asked what he meant by "open" alcohol. Defendant Arrowood replied, "that big bottle of fucking Smirnoff that's in there." *Id.* at 9:23–38. Plaintiff responded, "it's in a crate," acknowledging that she had alcohol. *Id.* at 9:38.

A few minutes later, Plaintiff again discussed the bottles with Defendant Arrowood. He told her, "You had open alcohol in there." Plaintiff responded, "I don't know what you mean by open alcohol. You can't have a bottle that's closed? Why?" When Defendant Arrowood answered, "Because it's open," and explained that it was "half gone," Plaintiff did not dispute that fact.

Instead, she explained that it had "been that half gone" since camping and that she kept it in the backseat. *Id.* at 13:15–33. Plaintiff later confirmed in her deposition that at least one bottle in the vehicle contained alcohol. ECF No. 28-6 at PageID.313. The video footage further shows that the bottles were partially empty. ECF No. 28-3 at 25:40. On this record, officers had ample reason to believe Plaintiff possessed open intoxicants and knew of their presence.

Plaintiff nonetheless contends that her conduct fell within a statutory exception. Under § 257.624a(1), there are two exceptions set out in subsections (2) and (5). Subsection (5) is plainly inapplicable because it applies only to "commercial quadricycles," not minivans like Plaintiff's. *Id.* at § 257.624a(5).

Plaintiff instead invokes subsection (2), which permits transport of open containers only when the vehicle lacks a separate trunk and the container is secured in a locked glove compartment, placed behind the last upright seat, or stored in an area not normally occupied by the driver or passengers. *Id.* § 257.624a(2). Plaintiff argues that her minivan had a "stow-a-way" seat feature that allowed her to put all the second- and third-row seating down while driving. ECF No. 35 at pageID.510. She argues that her rear seats were "perpetually folded down," *id.*, so the alcohol crate must have been in the "last upright seat" in an "area not normally occupied by the operator or a passenger" under § 257.624a(2).

But the dash cam video evidence clearly indicates that there is a second row of seats visibly upright, not down as Plaintiff claims:



ECF No. 28-3 at 31:51.

Plaintiff further argues that what is visible on the dash cam is a "backrest, not a seat" and that the "backrest to the very back third row seat did not stow away below the floor, but the seats did." ECF No. 35 at PageID.511. But Plaintiff does not cite to any evidence in the record to support this assertion. *See generally* ECF Nos. 35; 31-1. And "[c]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment." *See, e.g., Gooden v. City of Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). Accordingly, Defendants had probable cause to

arrest Plaintiff for violating MICH. COMP. LAWS § 257.624a(1) for open intoxicants.[8] So Plaintiff's unlawful arrest theory fails.

### b. Clearly Established

Even if Plaintiff could establish that Defendants lacked probable cause for her arrest, Defendants are entitled to qualified immunity because their conduct was not clearly established as unconstitutional on the date of Plaintiff's arrest. Again, Plaintiff bears "the burden of showing that the right was clearly established." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). Plaintiff has not met that burden.

Plaintiff cites only two cases. The first case is *People v. Olsen*. ECF No. 35-4. But *Olsen* is a state court case, and the Sixth Circuit held in *Bell* that "for a right to be clearly established, "existing *precedent* must have placed the statutory or constitutional question beyond debate." 37 F.4th at 368 (emphasis in original). Because state circuit court cases are not binding precedent of the Sixth Circuit or the Supreme Court, they cannot clearly establish that conduct as unconstitutional. The second case Plaintiff cites is *Harris v. City of Saginaw*, 604 F. Supp. 3d 633 (E.D. Mich. 2022), a non-binding District Court decision, that cannot clearly establish that Defendant's conduct is unconstitutional under the *Bell* rule. Thus, Defendant's conduct is subject to qualified immunity, meaning neither Fourth Amendment theory that Plaintiff advances in Count I survives summary judgment.

---

[8] This Court need not assess whether Defendants had probable cause to arrest Plaintiff for OWI because "Defendants only need[] probable cause to arrest [Plaintiff] on *a* charge; they [do] not need probable cause to arrest [her] on *all* charges." *Atkins*, 94 F. App'x at 348.

### 3. Count II: Unlawful Search

Next, Plaintiff alleges that Defendants violated her Fourth Amendment rights because they "subjected her to searches of her person and vehicle without permission or any lawful basis." ECF No. 1-1 at PageID.14. But Plaintiff has not addressed either of Defendants' responses addressing the claim in her Response to their motions for summary judgment. *See generally* ECF Nos. 31; 35. "A plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown*, 545 F. App'x at 372 (6th Cir. 2013). So this Court will treat this claim as abandoned.

Even if Plaintiff had not abandoned this claim, Defendants are entitled to qualified immunity because their conduct was not clearly established as unconstitutional on the date of Plaintiff's arrest. Plaintiff has not provided any case law that demonstrates that Defendants' conduct violated her Fourth Amendment rights by searching her vehicle or her person pursuant to arrest. *See generally* ECF Nos. 31; 35. Again, Plaintiff bears the burden of showing that a constitutional right is clearly established. *See Bell*, 37 F.4th at 367. Plaintiff has not met her burden, so Defendant's conduct is subject to qualified immunity on this Fourth Amendment theory in Count II.

### 4. Count II: Search Warrant Obtained Under False Pretenses

Next, Plaintiff argues that Defendants violated her Fourth Amendment rights by obtaining a search warrant under false pretenses to conduct a blood draw. ECF No. 1-1 at PageID.14.

The Fourth Amendment permits a search warrant only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the . . . things to be seized." U.S. Const. amend. IV. "Probable cause exists 'if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched.'" *Peffer v. Stephens*, 880

F.3d 256, 263 (6th Cir. 2018) (quoting *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996)). Officers may ordinarily rely on a judicially issued warrant and receive immunity from § 1983 liability unless the warrant so clearly lacks indicia of probable cause that reliance becomes unreasonable. *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989). That protection falls away, however, if an officer secures the warrant by knowingly or recklessly including false statements or omissions that prove material to the probable-cause determination. *Id.*

A plaintiff may defeat qualified immunity by showing that (1) the warrant affidavit contained a deliberate or reckless falsehood or omission and (2) that defect was material to the magistrate's finding of probable cause. *Tlapanco*, 969 F.3d at 649; *see also Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). Once a plaintiff makes the first showing, a court must "set aside the [false] statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010).

Plaintiff points to one asserted falsehood in the blood-draw warrant: the statement that officers observed "Minimum Nystagmus." ECF Nos. 35 at PageID.515; 28-7 at PageID.329. The dash-camera audio supports her point. When the officers discussed the test, Defendant Jones stated that he did not observe nystagmus: "I didn't notice any nystagmus, no." ECF No. 28-3 at 17:23–37. That evidence shows a contradiction between what Defendants believed at the scene and what the affidavit reported. Plaintiff therefore satisfies the first step by identifying a false statement. *See Butler v. City of Detroit*, 936 F.3d 410, 419 (6th Cir. 2019).

But the false statement does not carry the day because it was not material to probable cause. Even without the "minimal nystagmus" notation, the affidavit contained ample grounds to support a blood-draw warrant: Plaintiff (1) committed a lane violation, (2) smelled of alcohol, (3) possessed alcohol in her van, (4) admitted to consuming alcohol earlier in the night, (5) admitted

to consuming marijuana, and (6) refused sobriety field testing other than the horizontal gaze nystagmus test. ECF Nos. 29 at PageID.361; 28-7 at PageID.329. The Sixth Circuit has found probable cause on materially similar facts. *Kinlin v. Kline*, 749 F.3d 573, 580 (6th Cir. 2014).[9] And officers seeking a warrant typically recount the same facts that supported probable cause for arrest. *Birchfield v. North Dakota*, 579 U.S. 438, 469 (2016). Because the corrected affidavit still establishes probable cause, Defendants did not violate the Fourth Amendment and remain entitled to qualified immunity. *See Sykes*, 625 F.3d at 305. Thus, Count II does not pass muster.

### 5. Count III: Excessive Force

#### a. Constitutional Analysis

Next, turn to Plaintiff's Fourth Amendment excessive force claims against Defendant Arrowood. The Fourth Amendment protects people from "unreasonable searches and seizures." *Vanderhoef*, 938 F.3d at 276 (citing U.S. Const. amend. IV). An officer's use of excessive force constitutes an unreasonable seizure, thus violating the Fourth Amendment. *Id.* Plaintiff argues that Defendant Arrowood violated her Fourth Amendment rights when he "physically grabbed and

---

[9] Plaintiff contends that Defendants were required to explain the consequences of refusing a PBT under Mich. Admin. R. 325.2658, Rule 8(6), and the Michigan State Police Training Manual ("Training Manual"). But Rule 8(6) does not contain a requirement that officers inform an individual of what a PBT is before administering the test, and the Plaintiff does not identify an applicable section in the Training Manual. And regardless, Plaintiff still refused to take the PBT outright, see ECF No. 28-3 at 13:54, and, under Kinlin, it is only relevant whether Plaintiff refused to take a sobriety test, not whether all procedures for administering the test were followed. *See Kinlin*, 749 F.3d 573 at 580. Plaintiff also argues that she did not refuse to conduct the heel-toe sobriety test. ECF No. 35 at PageID.515. While Plaintiff does state that she will "walk [Defendant Jones'] line," ECF No. 28-3 at 11:37, this is only after repeatedly denying that she would take the test because she was "freezing" and "shaking," and Defendant Jones had moved on to asking Plaintiff to take the PBT. *See id.* at 8:30–10:20. And Plaintiff reneges immediately after stating that she would take the heel-toe test by again reiterating this time to Defendant Arrowood that she would not be able to do the heel-toe test because her legs were shaking, and she was freezing. *Id.* at 12:15.

violently [threw]" her onto the ground after she had slipped a hand out of her handcuff. ECF No. 1-1 at PageID.15. Not so.

Fourth Amendment jurisprudence "has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical" force "to effect it." *Graham*, 490 U.S. at 396. To determine whether an officer's degree of force was excessive, courts ask whether the force used was objectively reasonable. *VanPelt v. City of Detroit*, 70 F.4th 338, 340 (6th Cir. 2023). In so doing, courts must not apply the "20/20 vision of hindsight" from the "comfort of their chambers." *Id.* (cleaned up). Not "every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Graham*, 490 U.S. at 396. Courts must instead consider the perspective of a reasonable officer on the scene, understanding that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." *Id.* at 396–97.

Adopting that perspective, courts must analyze "whether the totality of the circumstances justifies a particular level of force." *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019). Three non-dispositive factors guide this analysis: (1) the severity of the crime at issue, (2) the immediacy of the threat the suspect posed to the safety of the officer or others, if any, and (3) the suspect's active resistance or evasion, if any. *Wright*, 962 F.3d at 865. Many cases "rise and fall with the third factor." *Shanaberg v. Licking Cnty.*, 936 F.3d 453, 456 (6th Cir. 2019). But at day's end, the analysis is "context-sensitive," and courts "must consider all the relevant circumstances" known to the officers, "including facts and events leading up to the climactic moment" of force. *Barnes v. Felix*, 145 S. Ct. 1353, 1356–59 (2025). Put differently, an officer's use of force "cannot be hermetically sealed off from the context in which [it] arose." *Id.* at 1358 (citation modified). And

- 27 -

"[t]aking account of that context may benefit either party in an excessive-force case." *Id.* After all,

[p]rior events may show," why "a reasonable officer would have perceived otherwise ambiguous

conduct . . . as threatening." *Id.* While the first and second factors favor Plaintiff, the third factor

favors Defendant Arrowood, revealing that his use of force was reasonable.

 ***Severity of the crime.*** Consider the severity of the crime. In assessing the severity of a

plaintiff's crime, the Sixth Circuit has analyzed several relevant factors: whether (1) the plaintiff

was suspected of or committed a felony or a misdemeanor—felonies are, at the very least,

moderately severe; (2) the plaintiff was violent—violent offenses are more severe than others; (3)

the plaintiff was suspected of being involved in an underlying crime—compounding offenses can

increase the severity; (4) the officers were responding to an emergency call or the plaintiff was

otherwise exacerbating public safety concerns. *See Shumate v. City of Adrian*, 44 F.4th 427, 440–

42 (6th Cir. 2022) (collecting cases).

 Turn to Plaintiff's alleged crimes. Plaintiff was initially arrested for OWI and possessing

open intoxicants, violating MICH. COMP. LAWS § 257.625(1) and § 257.624(a), respectively, ECF

No. 28-2 at PageID.282, both of which were misdemeanors.[10] Plaintiff's conduct on the dash cam

video was not violent. Further, she was not suspected of any compounding offenses, and the

officers were not responding to an emergency call when they initiated the traffic stop against

Plaintiff. Thus, the alleged offenses were relatively minor compared to Defendant Arrowood's

moderate force, so this factor favors Plaintiff.

 ***Immediacy of the threat.*** Shifting to the second factor, Plaintiff did not pose an immediate

threat to Defendant Arrowood. This was not a situation where Plaintiff was "particularly violent

---

[10] While OWI can be a felony offense under Michigan law, none of the required felony
enhancements apply to Plaintiff's conduct. *See* MICH. COMP. LAWS § 257.625.

or physically resistant, so as to endanger responders." *Kent v. Oakland Cnty.*, 810 F.3d 384, 391 (6th Cir. 2016); *cf. Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94 (6th Cir.2012) (plaintiff ran from police while "flailing his arms violently"); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012). Defendant does not identify any actions in which Plaintiff attempted to hit him. *See Rudlaff v. Gillispie,* 791 F.3d 638, 640 (6th Cir. 2015) (finding tasing reasonable where claimant "puffed out his chest and stared down [the officer]," then swung his arms twice toward officers). Rather, though one hand was uncuffed, Plaintiff remained seated with her hands behind her back, engaged in conversation with the Defendants, immediately before Defendant Arrowood saw that she was uncuffed. *See* ECF No. 28-3 at 22:02–15. Thus, this factor also weighs in favor of Plaintiff.

**Degree of resistance or evasion.** Moving to the third factor, the degree of Plaintiff's resistance or evasion. This factor supports that Defendant Arrowood used objectively reasonable force.

Relevant here, the Sixth Circuit generally places resistance into two categories: passive and active. *See Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). And this distinction matters because the category of resistance affects the amount of force an officer may use to arrest someone. *See Chaney-Snell v. Young*, 98 F.4th 699, 717–18 (6th Cir. 2024) (concluding that dating back to the English common-law, the permissible degree of force an officer could use to effectuate an arrest depended on the degree of resistance from an arrestee) (collecting sources).

People passively resist when, without using "overtly threatening language," they are verbally uncooperative, insulting, or argumentative. *Shumate*, 44 F.4th at 447–48; *see also Goodwin*, 781 F.3d at 323–24. In other words, passive resistance "entails a lack of physical

resistance," flight, or verbal threats. *King v. City of Rockford*, 97 F.4th 379, 396 (6th Cir. 2024) (citation modified). When someone passively resists, officers may use minimal force to carry out an arrest, so long as the force is not "gratuitous." *See Chaney-Snell*, 98 F.4th at 715 (collecting cases); *Gambrel v. Knox Cnty.*, 25 F.4th 391, 402 (6th Cir. 2022) (noting that where, as here, "officers have the right to arrest a suspect for committing a crime . . . they may use some force to carry out the arrest"). For example, "officers may grab a person's arms to effectuate an arrest, control an uncertain situation, ensure compliance, or escort an arrestee to their patrol vehicles." *Collazo v. Otsego Cnty.*, No. 1:23-CV-11849, 2025 WL 2601528, at \*12 (E.D. Mich. Sept. 8, 2025) (collecting cases). But they may not use substantial force like tasers or strikes when someone passively resists. *See, e.g., Goodwin*, 781 F.3d at 323–28; *Shumate*, 44 F.4th at 447; *Wright*, 962 F.3d at 871.

By contrast, one actively resists arrest "by physically struggling with police, threatening them, resisting handcuffs, or acting erratically." *Moore*, 126 F.4th at 1168. When someone actively resists officers, officers may use substantial force—like compliance strikes (kicking, kneeing, and punching to secure compliance), muscling techniques (including takedowns), tasers, batons, and pepper spray—to arrest the person. *See, e.g., Rudlaff v. Gillispie*, 791 F.3d 638, 641–43 (6th Cir. 2015) (taser or knee strikes); *King*, 97 F.4th at 396 (same); *Moore*, 126 F.4th at 1168 (collecting cases); *Ennes*, 773 F. Supp. 3d at 418 (collecting cases). But an officer must reduce the amount of force that they use to no force or minimal, non-gratuitous force once a suspect is neutralized or ceases to actively resist. *See Gambrel*, 25 F.4th at 402.

This case involves both passive and active resistance. The interior dash-cam footage shows Defendants Arrowood and Jones noticing that Plaintiff sat uncuffed in the back of the cruiser. *See* ECF No. 28-5 at 22:04. Both Defendants exited the vehicle and approached the rear passenger-

side door, which Defendant Arrowood opened. *Id.* at 22:05–22:10. From there, Defendant Arrowood appears lightly grasped Plaintiff's arm to recuff her. *Id.* at 22:12–22:17. Plaintiff responded with verbal noncompliance—asking "what are you doing?" and withholding her hands. *Id.* This is passive resistance. *See Shumate*, 44 F.4th at 447–48; *see also Goodwin*, 781 F.3d at 323–24. And Defendant Arrowood's arm grab is minimal and non-gratuitous, used to carry out the arrest. *See Chaney-Snell*, 98 F.4th at 715 (collecting cases). Sixth Circuit precedent permits officers to grab an arm to effectuate an arrest. *See Collazo*, 2025 WL 2601528, at *12 (collecting cases). Defendant Arrowood's initial effort to recuff Plaintiff therefore did not constitute excessive force.

Still, the situation escalated. As Defendant Arrowood attempted to recuff her, Plaintiff physically resisted—pulling away, struggling, and grabbing the headrest in front of her. ECF No. 28-5 at 22:17–20. At that point, Plaintiff's resistance had crossed from passive to active, warranting substantial force like takedown maneuvers. *See Moore*, 126 F.4th at 1168; *King*, 97 F.4th at 396; *LaPlante v. City of Battle Creek*, 30 F.4th 572, 583 (6th Cir. 2022); *Parsons v. City of Ann Arbor*, No. 22-1338, 2023 WL 3413898, at *3 (6th Cir. May 12, 2023). Thus, Defendant Arrowood's removing Plaintiff from the vehicle and taking her to the ground to secure the handcuffs was constitutionally permissible.[11] *Id.* at 22:21. And the brevity of Plaintiff's resistance does not change the analysis; even minimal resistance counts. *See Rudlaff*, 791 F.3d at 643.

---

[11] There is a dispute as to how much force Defendant Arrowood used when he pulled Plaintiff from the cruiser. Defendant Arrowood asserts that Plaintiff was pulled from the car with "minimal force" and "guided to the ground." ECF No. 28 at PageID.269. Yet Plaintiff argues that he "slammed" her on the ground and "brought his full weight onto his knee into her back." ECF No. 31-1 at PageID.397. But Plaintiff does not cry out in agony after being taken to the ground, but instead repeatedly asked, "what are you doing," in response to the takedown. ECF No. 28-3 at 22:20–25. Regardless, when someone actively resists, as Plaintiff did, officers may use substantial force to effectuate the arrest.

At bottom, Defendant Arrowood used objectively reasonable force under the circumstances. So his force did not violate Plaintiff's constitutional rights.

### b. Clearly Established

Even if Defendant Arrowood used excessive force, it was not clearly established on December 13, 2020, that his conduct was unconstitutional. So he is entitled to qualified immunity.

Plaintiff offers two cases that she believes clearly establish that Defendant Arrowood's conduct was unconstitutional. Neither is persuasive.

The first case is *Standifer v. Lacon*, 587 F. App'x 919 (6th Cir. 2014). But *Standifer* is inapplicable for two reasons. First, the plaintiff in *Standifer* alleged a takedown after she kicked an officer in the groin. *Id.* at 922. This fact pattern is not close to the Plaintiff's situation, where she was recuffed after slipping out of a handcuff. *See* ECF No. 28-5 at 22:04. And in any event, the Sixth Circuit found that a takedown was reasonable because the plaintiff had, like Plaintiff here, actively resisted. *See Standifer*, 587 F. App'x at 924. Second, *Standifer* is an unpublished opinion, and the Sixth Circuit has held that unpublished opinions cannot clearly establish the law. *Bell*, 37 F.4th at 367. Thus, *Sandifer* does not clearly establish that Defendant Arrowood's conduct was unconstitutional.

Next, Plaintiff offers *Crystal Poole v. Gee*, No. 8:07-CV-912-EAJ, 2008 WL 3367548 (M.D. Fla. Aug. 8, 2008). But *Crystal Poole* is a District Court case from Florida and is not binding on this Court. To clearly establish that conduct is unconstitutional, a case must be binding. *See Bell*, 37 F.4th at 367–68. Thus, *Crystal Poole*, too, cannot clearly establish that Defendant Arrowood's conduct was unconstitutional. As a result, Defendant's conduct is protected by qualified immunity, and Plaintiff's excessive force claim (Count III) fails.

### B. Count IV: Plaintiff's State-Law ELCRA Claim

Lastly, Plaintiff asserts that Defendant Arrowood violated ELCRA by denying Plaintiff

"her right to traverse the streets as she pleased," which Plaintiff contends was "based on her sex."

ECF No. 31-1 at PageID.398-400. She contends that Defendant Arrowood denied her the "use of

the roads," which she claims "is a 'public accommodation'" under ELCRA. MICH. COMP. LAWS §

37.2301(a). Under ELCRA, a "public accommodation" is as follows:

> [A] business, or an educational, refreshment, entertainment, recreation, health, or
> transportation facility, or institution of any kind, whether licensed or not, whose goods,
> services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or
> otherwise made available to the public.

*Id.* at § 37.2301(a). Plaintiff contends that roads constitute a "transportation facil[ity]." ECF No.

31-1 at PageID.398. This argument lacks merit.

In statutory interpretation, a court is to "begin by construing the language of the statute

itself." *People v. Maynor*, 470 Mich. 289, 295 (2004). Where the language is unambiguous, a court

is to give the words their plain meaning and apply the statute as written. *Id.* (citing *People v.*

*Borchard–Ruhland*, 460 Mich. 278, 284 (1999)). Lay dictionaries define a facility as "something

(such as a hospital) that is built, constructed, installed, or established to perform some particular

function or to serve or facilitate some particular end." *E.g.*, *Facility*, WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY (1976). Thus, "facility" in this context does not refer to a road but

rather to a building or place.

This reading of "facility" aligns with familiar canons of statutory construction. Take

*noscitur a sociis*: a word draws meaning from its neighbors. *See In re Complaint of Rovas Against*

*SBC Michigan*, 482 Mich. 90, 114 (2008) Courts apply that canon to avoid giving a single term a

breadth that clashes with the surrounding words and distorts the statute as a whole. *Gustafson v.*

*Alloyd Co.*, 513 U.S. 561, 575 (1995). Here, a "transportation facility" would have to be interpreted

in line with the rest of the statute. ELCRA's definition of a public accommodation follows that pattern. It lists "a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind" that offers services to the public. A "transportation facility" sits alongside places like schools, restaurants, theaters, gyms, and clinics—each a physical location where one goes to obtain services. And the definition begins with "a business," reinforcing that common feature. Read together, the statute points to facilities that operate as businesses, not to roads.

Even if Plaintiff were right that § 37.2301(a) reaches roads, her claim still fails on causation. ELCRA bars the denial of full and equal enjoyment of a public accommodation "because of" sex. MICH. COMP. LAWS § 37.2302(a). The Michigan Supreme Court has held that the operative phrase "because of" establishes a but-for causation standard. *Hecht v Nat'l Heritage Academies, Inc*, 886 N.W.2d 135 (Mich. 2016); *Rouch World, LLC v. Dep't of C.R.*, 510 Mich. 398, 420 (2022).

Here, Plaintiff does not meet that standard. She offers no evidence that, but for her sex, Defendant Arrowood would not have stopped her. Instead, she urges the Court to infer discriminatory intent from circumstantial evidence—specifically, her claim that Defendant muttered a slur under his breath. But the dash-cam video does not support that assertion. *See generally* ECF No. 28-5. Plaintiff concedes as much, acknowledging that the alleged remark is difficult to discern on the recording. ECF No. 31-1 at PageID.384. And courts need not credit assertions that the record plainly contradicts. *Scott*, 550 U.S. at 380. Moreover, where a video captures the underlying events, a court's eyes are not closed to the realities of such evidence in the record. *See Moore*, 126 F.4th at 1167. Rather, courts are "free to assess" video evidence "'in the light depicted by the videotapes.'" *Id.* (quoting *Scott*, 550 U.S. at 381). The video evidence

blatantly contradicts Plaintiff's assertion. Therefore, there is no evidence that Plaintiff was discriminated against because of her sex.

In sum, none of Plaintiff's claims survive summary judgment. As a result, Defendants' Motions for Summary Judgment, ECF Nos. 28; 29, will be granted, and Plaintiff's Complaint, ECF No. 1, will be dismissed with prejudice.

## IV.

Accordingly, it is **ORDERED** that Defendant Paul Arrowood's Motion for Summary Judgment, ECF Nos. 28, is **GRANTED.**

Further, it is **ORDERED** that Defendant Bryan Jones's Motion for Summary Judgment, ECF No. 29, is **GRANTED.**

Further**,** it is **ORDERED** that Plaintiff's Complaint, ECF No. 1, is **DISMISSED WITH PREJUDICE.**

**This is a final order and closes the case.**

Dated: January 22, 2026                                    s/Thomas L. Ludington
                                                          THOMAS L. LUDINGTON
                                                          United States District Judge